**UNITED STATES DISTRICT COURT**

**DISTRICT OF MAINE**

U.S. DISTRICT COURT
DISTRICT OF MAINE
PORTLAND
RECEIVED & FILED

NOV 24 2025

ERIC M. STORMS, CLERK

BY_____
DEPUTY CLERK

AMAN E. TAFFERE,                            )

Plaintiff,                                  )

v.                                          )                    Case No.

                                            )

COVETRUS, INC.,                             )

                                            )

Defendant.

**COMPLAINT AND JURY DEMAND**

## I. INTRODUCTION ¶¶1–4

1. This action arises from Covetrus, Inc.'s sex-based discrimination and retaliation against Plaintiff **Aman E. Taffere**, culminating in his termination less than twenty-four hours after he observed remote-access activity on his Covetrus-issued laptop while he was reviewing confidential attorney-client communications.

2. Before the termination, Plaintiff reported sex-based favoritism to HR and filed agency charges.

3. Covetrus later told Plaintiff he was being separated because of "low workload" and a "reduction in force." Given the timing, Covetrus's inconsistent explanations, and the sequence set out below, the stated 'reduction in force' was pretextual.

4. Plaintiff brings claims under Title VII and the Maine Human Rights Act (discrimination and retaliation), the Maine Whistleblowers' Protection Act (retaliation), and seeks legal

and equitable relief.

## II. JURISDICTION AND VENUE ¶¶5–6

5. **Jurisdiction.** This Court has jurisdiction under 28 U.S.C. § 1331 because the complaint includes claims under Title VII. The Court has supplemental jurisdiction over related state claims under 28 U.S.C. § 1367(a).

6. **Venue.** Venue is proper in the District of Maine under 28 U.S.C. § 1391(b) and 42 U.S.C. § 2000e-5(f)(3) because a substantial part of the events or omissions giving rise to the claims occurred in Cumberland County, Maine, where Covetrus is headquartered.

## III. PARTIES ¶¶7–8

7. Plaintiff **Aman E. Taffere** is, and at all relevant times was, a resident of Gorham, Maine.

8. Defendant **Covetrus, Inc.** is a Delaware corporation with its principal place of business in Portland, Maine.

## IV. ADMINISTRATIVE EXHAUSTION ¶¶9–11

9. Plaintiff filed a timely EEOC charge alleging sex discrimination and retaliation. The EEOC issued a Notice of Right-to-Sue dated August 27, 2025, and this action is filed within 90 days. Exhibit A

10. Plaintiff also filed a timely charge with the Maine Human Rights Commission, which issued a Right-to-Sue letter on October 15, 2025; this action is timely under Maine law. Exhibit B

11. Plaintiff's June 26, 2025 termination occurred after the initial agency filings and is reasonably related to, and grew out of, the discrimination and retaliation already before the EEOC and MHRC. It is properly included in this action.

## V. FACTUAL BACKGROUND

**Employment via VTS (2022–2023) ¶¶12–34**

12. Beginning in or about February 2022, Plaintiff supported Covetrus as a contractor through Voice Teleservices (VTS) in Customer Service.

13. At that time, Plaintiff observed serious service issues, including an email queue that was more than six months old, long call hold times, delayed shipments and shipping to incorrect addresses, and publicly posted customer reviews criticizing Covetrus's customer service.

14. Plaintiff took these complaints as a challenge to improve the service experience and to correct the unprofessional email practices that were being reported.

15. To improve service quality, Plaintiff standardized customer correspondence and internal notes with structured headings, selective bold and italics for key details, and a concise hand-off checklist; managers adopted these practices team-wide.

16. These conventions were applied manually in each message and reduced repeat contacts and handling time across the queue.

17. Plaintiff implemented these changes in response to recurring customer feedback that

3

prior emails were unclear.

18. To improve handoffs between agents and the pharmacy, Plaintiff implemented a five-point handoff notation identifying: the issue, the specific data needed, the next action, the responsible owner, and the target time to completion.

19. Plaintiff applied this handoff notation to communications among pharmacy operations, internal systems, clinics, and customers, which reduced misrouted work and unnecessary follow-ups.

20. Although the manual drafting required additional time, Plaintiff's throughput and quality metrics remained among the highest on the team.

21. Among VTS agents assigned to Covetrus work across queues, Plaintiff consistently led in throughput and quality, with daily metrics approximately 40–70% above requirement. The Follow-Up queue was generally viewed as the highest-complexity work basket and produced repeat issues if not handled correctly. Plaintiff's production and quality gained the attention of Covetrus management, including Alexis Remariz ("Remariz") (Exceptions Specialist) and Yarixta Rodriguez ("Rodriguez") (then a manager, later a supervisor).

22. Before Plaintiff's assignment to the Follow-Up queue, the Follow-Up workload was routinely handled by three to four agents.

23. After approximately one month working Follow-Up alongside other agents, Remariz designated Plaintiff as the only agent assigned to that queue, based on his performance. Plaintiff then held the Follow-Up assignment for roughly 2 years, resolving client, clinic,

4

and pharmacy issues and reducing repeat returns to the queue.

24. For approximately two years, Plaintiff was primarily assigned to the Follow-Ups queue; during that period, the queue remained within Covetrus's one-week standard, and he resolved client, clinic, and pharmacy issues.

25. While Plaintiff was reducing the Follow-Up workload, he observed that many agents, leads, Seniors and managers were not consistently adhering to the standardized procedures.

26. As a result of these departures from the standard, cases repeatedly returned to the Follow-Up queue.

27. Plaintiff reported these observations to Remariz, the Follow-Up work-basket Manager, on or about June 2022.

28. Remariz told Plaintiff to apply an Agent Error to cases where procedures were not followed.

29. Plaintiff began applying Agent Error designations to such cases and provided step-by-step guidance to correct the issues and prevent recurrence.

30. After this practice was implemented, the number of repeat cases significantly declined, although some noncompliance by agents, leads, seniors, and managers continued.

31. To help eliminate the backlog, Plaintiff voluntarily worked after scheduled hours to bring the work baskets current.

32. In or about August 2022, while Plaintiff was still performing Covetrus work through

VTS, Remariz asked Plaintiff if he had been working outside his scheduled Covetrus hours. Plaintiff explained that he sometimes stayed past his punch-out time to finish Covetrus follow-up cases because other agents were not following the standardized procedures and the queue was filling back up. Plaintiff further explained that he was also the closing manager for VTS and that, while he was still on site closing for other VTS clients, he used that time to clear Covetrus cases. Remariz acknowledged this explanation and did not tell Plaintiff to stop.

33. From that point forward, Covetrus, through Remariz, who supervised and directed Plaintiff's day-to-day work in the Follow-Up queue, knew as of August 2022 that Plaintiff occasionally worked outside his scheduled hours to resolve Covetrus backlogs.

34. When the VTS partnership ended, the customer email backlog at Covetrus was approximately three days, which was a reduction from the initial six month backlog.

**Recruitment and Hire into Senior Role (Nov. 2023–Mar. 2024) ¶¶35–38**

35. From November 2023 to February 2024, Covetrus actively recruited Plaintiff for full-time employment and engaged in several compensation discussions.

36. After Plaintiff declined a third offer because the compensation was not fair, Vice President of Customer Experience Nick P. contacted David Sawicki about creating a role that would fit Plaintiff's requested pay range.

37. On January 18, 2024, after Plaintiff declined earlier recruiting overtures, Vice President Nick P. instructed recruiting to open a Senior role in Plaintiff's pay range for the purpose of recruiting Plaintiff.

6

38. On or about early February 2024, recruiter Joe Vu contacted Plaintiff about a newly opened Senior Customer Service Exceptions Representative position and asked if Plaintiff was interested. Plaintiff accepted on February 9, 2024 and onboarded in March 2024.

**Performance, Overtime, and Training Assurances (2024) ¶¶39–55**

39. During onboarding, Plaintiff observed that the email and work basket queues he had previously helped to reduce had risen to about 90 days in the time between the end of the VTS engagement and Covetrus's recruitment of Plaintiff.

40. During onboarding, Rodriguez granted permission for Plaintiff to work additional hours to reduce the backlog and showed him where overtime opportunities were posted for different work baskets.

41. Rodriguez stated that after Justin Martin's ("Martin") training concluded in May 2024, Plaintiff would begin cross-training in June.

42. Throughout the 30-day onboarding and training period, Plaintiff routinely worked roughly two hours before his shift and two hours after his shift.

43. After training, and for the remainder of 2024, Plaintiff averaged approximately eleven-hours per day in the Senior role.

44. Plaintiff reduced queues so that email responses remained within Covetrus's one-week response-time standard.

45. When formal overtime was unavailable and repeat cases increased, Plaintiff worked

before clock-in and after clock-out, with management's knowledge, to keep queues current as alleged in ¶¶31-33.

46. In a monthly one-on-one meeting, Rodriguez told Plaintiff he had done an "incredible job" reducing the backlog and that his drive to improve the Customer Service department and Covetrus was commendable. Plaintiff received this kudos on Medallia.

47. Rodriguez confirmed that once Martin finished in May 2024, Plaintiff was scheduled to begin cross-training in June.

48. Relying on those assurances, Plaintiff continued to work extra hours to keep queues within the one-week standard.

49. Plaintiff's performance remained strong throughout 2024.

50. Plaintiff was at all relevant times qualified for the Senior role and had already been performing Senior level work while at VTS.

51. Plaintiff's training sequence in 2024 followed from his compensation negotiations and later acceptance (after Mr. Martin), not from any lack of qualification.

52. Plaintiff reasonably expected to receive the same or better training opportunities as later promoted agents because he was the second Senior and because management had praised his backlog reductions.

53. Plaintiff performed strongly, contributed workflow improvements, helped eliminate the backlog and was the top producer in his department in 2024.

54. Before Covetrus's May-June 2024 training and promotion decisions favoring newer

female agents, Covetrus regarded Plaintiff as a high-performing, reliable Senior and told him so.

55. Against that backdrop, beginning in May 2024, management expanded the Senior team and adopted promotion/training decisions that treated Plaintiff less favorably than newly promoted female agents.

**Managerial Bias and Disparate Treatment ¶¶56-94**

56. On or about April 2024, Rodriguez met with Plaintiff and Martin to discuss expanding the Senior team by adding six new agents.

57. Rodriguez presented a list of twelve CSR-1 candidates (11 women and 1 man) and asked for feedback. Based on their Follow-Up experience, Plaintiff and Martin concluded that only one clearly met the Senior standard; several others had histories of case-handling errors and repeat Agent Errors.

58. When asked to identify six candidates, Plaintiff provided the requested names but stated that, in his judgment, only one met the Senior criteria and the others were not yet at that level given quality and attention-to-detail issues previously observed in the Follow-Up queue.

59. On or about May 2024, Covetrus promoted six female agents to Senior roles, including Kelli, Heather, Kori, and Sairy (remaining names and last names known to Covetrus).

60. In early June 2024, during a one-on-one monthly meeting, Rodriguez informed Plaintiff that she had pushed his June cross-training to July to focus on integrating newly

promoted Seniors.

61. During a July 2024 Microsoft Teams conversation, Plaintiff and Martin observed that several newly promoted Seniors were repeating errors that had previously driven repeat cases back into the Follow-Up queue.

62. The recurring mistakes included miscalculating autoship adjustments (next-order date and frequency), failing to remove autoship when a client did not respond, and sending the wrong template to the wrong recipient.

63. During a July 2024 one-on-one monthly meeting with Rodriguez, Plaintiff reported that the new agents were making basic errors on cases, which were causing cases to come back into the queue and creating unnecessary and avoidable work. Plaintiff reiterated that Covetrus was essentially paying for the same work to be done two and three times in many cases due to poor handling.

64. Rodriguez informed Plaintiff to report these to Remariz for coaching.

65. From July 2024 through late August 2024, Plaintiff continued to send Remariz case examples showing these errors and stated that the new Seniors were causing a regression in the progress that had been made on reducing repeat cases.

66. On or about July 2024, via Microsoft Teams, Plaintiff communicated to Remariz that fellow Senior Heather omitted 'remove autoship' on numerous cases that had been updated by their veterinarian to a higher dosage. This caused unnecessary autoship orders to be placed.

67. On or about mid-July 2024, Rodriguez told Plaintiff his July cross-training was being pushed back again. As a result, Plaintiff's July training was deferred to August 2024.

68. In late July 2024, Senior Kori omitted frequency-adjustment details, causing early orders; Plaintiff reported this to Remariz.

69. At least one similarly situated female Senior who committed the same autoship error in July 2024 was coached rather than disciplined.

70. The lowered standard persisted and the same mistakes recurred.

71. In early August 2024, Plaintiff spoke to Cottle regarding numerous mistakes that continued to be made and caused repeated orders to be placed. Plaintiff informed Cottle that when Plaintiff reached out to those clients, they voiced their frustration at their account not being properly managed by Covetrus.

72. In early August 2024, Manager Cottle reassigned Plaintiff's August training slot to Kelli and pushed Plaintiff to September.

73. In September 2024, Plaintiff was informed his September training was being pushed again; Heather would train ahead of him. When Plaintiff asked why he was repeatedly skipped despite seniority (second Senior after Martin), management said it was a "business decision".

74. The August reassignment and September scheduling were reflected on the team training roster and approved by Cottle and Rodriguez.

75. In early October 2024, during a recorded video call, Martin told Plaintiff he had raised

with Rodriguez that it was not fair Plaintiff had again been skipped.

76. In mid-October 2024, during a recorded call with Remariz, Plaintiff reported being passed over for three consecutive months while newer female Seniors were placed into his slots; Remariz said he had been out of the loop on those decisions and that they were being made by Cottle and Rodriguez. He also stated, in substance, that he and Cottle had applied for the forthcoming supervisor role and that he believed he would not get the job because Covetrus culture favored female advancement.

77. Around this time, Plaintiff contacted Kylah O'Neil and reported his belief that he was being treated less favorably than newer female Seniors. O'Neil stated that Plaintiff should advocate for himself, that she did not understand why he was being skipped given his Senior sequence, and that training decisions were made by Cottle and Rodriguez. By October 2024, management already knew Plaintiff was complaining about sex-based favoritism.

78. In another mid-October 2024 recorded conversation, Martin stated that he too observed favoritism toward female agents, even when male agents outperformed.

79. Toward the end of October 2024, Plaintiff had his last one-on-one with Rodriguez and received a kudos for reducing the Follow-Up and work-basket email queues, bringing both current.

80. On or about early November 2024, Cottle became Supervisor, replacing Rodriguez.

81. After learning Cottle would become Supervisor, Plaintiff requested a meeting to discuss what he believed were discriminatory promotion and training decisions favoring newly

promoted female agents.

82. On or about early November 2024, during a one-hour recorded conversation, Plaintiff stated that his senior training had been skipped for the newer female agents and that he felt they were favoring female agents over males. Supervisor Cottle said the decisions were business-driven, that she and Rodriguez had made them, and that they planned to get Plaintiff into training by the end of 2024. Cottle also stated that she did not favor the female agents and that she valued Plaintiff's contributions to the team.

83. Shortly thereafter, Supervisor Cottle removed Plaintiff from the Follow-Up assignment and placed him in the less-favorable queue.

84. In mid-November 2024, during a monthly meeting with Cottle and Rodriguez, Plaintiff was informed that senior agents Heather and Kori had difficulty adjusting autoships when the frequency notes were provided in weeks. Cottle requested that Plaintiff change his case notes from weeks to months. Plaintiff informed Cottle that pharmacy cases were always given to the team in weeks by the pharmacy (PV1) and that changing them to months would lower the requirement expected of a Senior. Rodriguez told Plaintiff to "dumb it down" so others who could not do the autoship calculations could better understand it.

85. Plaintiff was informed this was the new standard and all seniors had to adopt it.

86. Plaintiff informed Cottle via Microsoft Teams that management was not holding the new seniors to high standards.

87. Plaintiff requested to meet with Vice President of Customer Experience Nick P.

13

88. Plaintiff raised these concerns in a meeting with Vice President of Customer Experience Nick P. and Ella Cottle (Supervisor). Plaintiff explained that newly promoted female Seniors were still making basic errors on autoship cases and pharmacy follow-ups and that they had difficulty doing autoship math when they were given in weeks and that, in his view, the internal standard for promotion had been lowered.

89. Nick P. agreed in substance that the standard needed to be raised and stated that Covetrus should be pushing agents to meet the basic requirements of the job, especially at the Senior level.

90. Shortly after this period, Plaintiff was again placed in less-favorable queues, excluded from the Follow-Up queue, and was scheduled last for training on the new Pharmacy and Cancellation queues despite being the second Senior hired.

91. In or about December 2024, Plaintiff received one training session in a single queue. The cross-training promised for five to six queues was not completed in 2024, and the remaining modules were deferred into 2025.

92. Plaintiff was the only Senior on his team paid 57 hours of unused PTO for 2024, reflecting his reliability, overtime work, and efforts to keep work baskets current.

93. Plaintiff's work in 2024 remained consistent with the performance that led Covetrus to open a Senior role that Plaintiff filled.

94. Plaintiff's Medallia kudos under Rodriguez ceased after Cottle became his supervisor, despite unchanged duties.

14

**Monitoring policy and scope. ¶95**

95. On December 6, 2024, Covetrus announced the roll-out of Five9 "Virtual Observer," describing live desktop monitoring and recording tied to customer calls and quality-assurance. Covetrus's FAQ stated that (i) all monitors are captured; (ii) Five9 cannot monitor an employee's desktop, video, or audio if the employee is not logged into Five9; and (iii) recording starts when an inbound call is accepted or an outbound call is initiated and ends when the call is dispositioned. Covetrus also referenced handbook provisions on business use of company resources and privacy expectations.

**HR Complaints / Protected Activity ¶¶96-131**

96. On or about January 2025, Plaintiff made internal complaints to management and Human Resources about disparate treatment and sex-based favoritism in training, scheduling and advancement.

97. Plaintiff spoke with HR representative Ashley (last name unknown) and provided her with Teams messages and other written communications with Rodriguez and Cottle that showed Plaintiff had been told he would begin cross training after Mr. Martin but was skipped in favor of newer female Seniors.

98. Plaintiff told HR representative Ashley that Rodriguez, Cottle and Remariz all knew he had been bypassed for the July, August, September and October 2024 training rotations while newer female agents, including Senior Customer Service Representatives Kelli, Heather, Sairy and Kori, were advanced ahead of him.

99. Ashley told Plaintiff that she would investigate his gender discrimination complaint and

15

that she would be speaking with Rodriguez, Cottle and Remariz about Plaintiff's allegations.

100.    On or about February 2025, while Plaintiff's HR complaint was still open, Covetrus issued Plaintiff an annual review rating him only "Meets Expectations" on a three-level scale ("Below Expectations," "Meets Expectations," "Exceeds Expectations"). This rating was given even though Plaintiff had averaged approximately eleven-hour days, had not called out, had reduced the queues to the required standard, had standardized email and notation conventions that other Seniors were using, and had been paid out 57 hours of unused PTO for 2024. Plaintiff told HR that the timing and the rating were retaliatory because they did not match his actual performance.

101.    On March 12, 2025, while his internal complaint remained pending and adverse actions continued, Plaintiff filed an EEOC charge for gender discrimination and retaliation concerning sex-based favoritism, retaliatory delays in training, and reduction in overtime opportunities. In context, the 'Meets Expectations' rating was materially adverse because it affected pay and advancement opportunities and contradicted contemporaneous performance feedback as alleged in ¶46 and ¶¶53–54.

102.    On or about late March 2025, during a company town hall viewed by the Customer Service team, Chief Commercial Officer (North America), Kelly Gottfried (Gottfried), stated in substance that Customer Service performance had dramatically improved over the prior year and displayed a chart reflecting that turnaround. Gottfried further stated that if you had asked me this time last year that our customer service would have made this kind of turn around, I would have called you a liar. The chart showed backlog

16

reductions beginning after Plaintiff's March 2024 onboarding and continuing to the end of 2024.

103.    Shortly thereafter, Supervisor Ella Cottle shared the same performance chart with the team on Microsoft Teams and, in substance, credited the improvement to the newly promoted female Seniors while omitting credit to Plaintiff and Mr. Martin, who had been the only designated Seniors prior to those promotions.

104.    Plaintiff spoke to Supervisors Cottle and Rodriguez about the Teams post and stated that it was not fair that Cottle credited only the female Seniors for the improvement while Plaintiff and Martin were omitted from the recognition. Plaintiff further showed them the overtime hours he had worked since his onboarding and his consistently exceeded daily metrics in resolving pharmacy cases, which aligned with the reduction in cases Gottfried had described.

105.    Plaintiff promptly reported these March 2025 postings to Human Resources, provided the performance chart and contemporaneous records reflecting his March 2024 onboarding and sustained overtime, and stated that Supervisor Cottle's post credited newly promoted female Seniors even though several of those same agents had been the subject of recurring, rudimentary case-handling errors previously documented to management. Plaintiff asked that HR address this as part of his pending discrimination/retaliation complaint.

106.    On or about late March 2025, Plaintiff met with HR representative Ashley and informed her that he had filed the EEOC charge.

107.    On or about April 2025, while Plaintiff's January 2025 HR discrimination complaint was still open, HR representative Ashley, Rodriguez, and Cottle told Plaintiff he was being written up for working off the clock in the mornings. As alleged in ¶¶31–33, Covetrus, through Remariz, had been told in August 2022 that Plaintiff sometimes continued working on Covetrus cases after his scheduled hours in order to clear follow-up backlogs, and Covetrus did not discipline him then. Raising this previously known practice only after Plaintiff's January 2025 protected complaints is consistent with retaliation.

108.    Saturday overtime was consistently scheduled for two Seniors each weekend before Plaintiff's exclusion.

109.    For approximately three months in 2025, Plaintiff was excluded from the regular Saturday Senior overtime rotation despite being available, and Cottle scheduled female Seniors instead. On one weekend, four female Seniors, Kori, Heather, Kelli, and Sairy, were scheduled for Saturday overtime while Plaintiff was not scheduled at all. After Plaintiff raised the issue, he was returned to the rotation, but the three-month exclusion reduced his overtime earnings and followed his protected complaints.

110.    On or about mid-April 2025, in a meeting with HR representative Ashley, Plaintiff stated that HR was not protecting him from continued retaliation and requested that his case be escalated. Around the same time, Rodriguez and Cottle told Plaintiff his removal from the monthly overtime rotation was a "mishap," said it would be fixed, and stated he would be returned to the rotation; despite this assurance, Plaintiff remained off the rotation for approximately three months.

111.    On or about late-April 2025, Plaintiff met with a Covetrus employee in the HR escalation/public relations function (name known to Covetrus) who handled discrimination and retaliation complaints. Plaintiff explained that he was experiencing ongoing microaggressions in Teams, slower response times than other agents, and removal from overtime after his protected complaint as alleged in ¶¶109–111.

112.    After conducting about a two-week review, the escalation officer (name known to Covetrus) informed Plaintiff that the matter was being closed and that the findings would be kept internal and would not be shared with him.

113.    Plaintiff objected that keeping the findings private was not fair, explaining that if a female employee had reported sex discrimination and then experienced retaliation during an open HR investigation, Covetrus would not have closed the matter without transparency. Plaintiff again requested escalation.

114.    On or about early-May 2025, Plaintiff met with Senior HR Representatives Mercedes Williams (Williams) and Mi'a Bailey (Bailey) regarding his request to escalate the matter and to address the continued retaliation. Williams and Bailey told Plaintiff that Covetrus was taking his accusations seriously and would provide a resolution on their investigation.

115.    On or about mid-May 2025, Plaintiff again met with Senior HR Representatives Williams and Bailey, and reported that management was loading him with Agent Errors in order to build a record for termination. Williams assured Plaintiff she would look into the matter and that Covetrus took this matter seriously.

19

116. On or about mid-May 2025, Plaintiff's cases and his morning client calls began receiving daily reviews that were not applied to similarly situated female Seniors.

117. When Plaintiff asked Supervisor Cottle about this, she stated that she had requested Quality Assurance (QA) to review every Senior's morning calls. When Plaintiff asked whether other Seniors were being reviewed, Cottle said the process was starting with Plaintiff and that all Seniors would have their calls reviewed to ensure proper handling.

118. As a result of this new morning-call review, Plaintiff began receiving numerous negative QA ratings that he had not previously received.

119. Plaintiff then asked Senior colleague Martin whether QA had reviewed his calls; Martin stated that no calls of his had been reviewed. Similarly situated female Seniors were not subjected to daily morning-call audits.

120. In the months following Plaintiff's January 2025 HR complaint and his March 2025 EEOC filing, Plaintiff was issued an unusually high number of Agent Errors, including about twenty in a single month, many of which were not actual errors. Plaintiff reported to Senior HR Representatives Williams and Bailey that Plaintiff felt managers were loading him with errors in order to build a record for termination.

121. Plaintiff told Senior HR Representatives Williams and Bailey that Supervisor Cottle had acknowledged several of those entries were duplicates and that, consistent with prior guidance from Remariz, duplicate mistakes should have been summarized as one issue rather than counted as multiple separate errors.

122. Shortly after Plaintiff's March 12, 2025 EEOC filing, the number of disputed Agent

Errors materially increased.

123.    On or about late May 2025, Plaintiff contacted the Maine Department of Labor (MDOL) to report unpaid off-the-clock work and to inquire about a lost-wages claim against Covetrus. Plaintiff reported that Supervisor Alexis had been aware for months that Plaintiff worked outside recorded shift windows, yet Covetrus later issued a "working off-the-clock" write-up. Plaintiff explained to MDOL that because management had used off-the-clock work they already knew about as a basis for discipline, he believed he should be compensated for that work.

124.    On or about the end of May, Plaintiff filed a complaint with the Maine Human Rights Commission.

125.    On June 6, 2025, Maine Department of Labor investigator Elaine Brackett emailed Plaintiff to report that, after conferring with Covetrus's counsel, the company was "looking to get the approval for 320 hours of off-the-clock work," proposing "$8,700.00 gross" and noting that "$8,803.20 would have been the gross amount at your current overtime rate." Plaintiff also reported that Supervisor Alexis had been aware for months that Plaintiff worked outside recorded shift windows, yet Covetrus later issued a "working off the clock" write-up.

126.    Plaintiff told the MDOL investigator he intended to consult outside counsel, and the investigator closed the MDOL file.

127.    Plaintiff alleges these facts: Covetrus had long known that Plaintiff occasionally worked outside scheduled hours to prevent repeat cases, as alleged in ¶¶31–33. The April

2025 write-up followed that longstanding knowledge and came after Plaintiff's protected complaints. Adverse actions followed Plaintiff's protected activity.

128. On or about mid-June 2025, Plaintiff had a meeting with Ms. Williams and Ms. Bailey, where Plaintiff informed them that he was going to consult an attorney due to Covetrus not taking any actions to protect Plaintiff from ongoing retaliation at work and discrimination.

129. Senior HR Representative Ms. Williams reassured Plaintiff that Covetrus is taking this matter seriously and would be getting back to him with their findings.

130. Although HR interviewed Plaintiff, Covetrus would later terminate Plaintiff under the guise of "low-workload" without providing its findings despite earlier assurances that it would follow up.

131. The retaliatory course of conduct described above continued through June 2025, culminating in the June 26, 2025 termination.

**Observation of remote access; temporal proximity ¶¶132-149**

132. On June 24, 2025, Plaintiff consulted attorney Sally Morris regarding sex-based discrimination and retaliation at Covetrus. Ms. Morris asked Plaintiff to send information concerning those issues.

133. When Plaintiff signed Covetrus's computer monitoring acknowledgment at the start of his employment, Covetrus represented that monitoring was for productivity and quality assurance. Covetrus did not inform Plaintiff that it would remotely view the contents of

his personal, password-protected webmail or attorney-client communications.

134.    On June 25, 2025, between approximately 5:30 p.m. and 7:30 p.m. Eastern Time, while using his Covetrus-issued laptop at home, Plaintiff was logged into his personal Gmail account in a web browser, using his own password, and was viewing emails with his attorney concerning this dispute. During that session, Plaintiff observed indicators of a live remote-control session: the cursor moved on its own; the mouse pointer moved smoothly across the screen and clicked into fields without his input; windows refocused; and the screen periodically refreshed or glitched in a way that appeared consistent with screenshots being taken. Plaintiff temporarily lost control of the cursor and experienced unusual lag. Plaintiff had previously experienced IT remotely accessing his computer on at least two occasions for troubleshooting, and the behavior he observed on June 25, 2025 was consistent with those prior remote-access sessions.

135.    On information and belief, Covetrus (or its agents) remotely accessed or attempted to access the device while those personal Gmail messages were open.

136.    On June 26, 2025, Plaintiff noticed he had an unscheduled meeting set up for 9:30 a.m. with Rachel and Stephanie (last names known to Covetrus).

137.    Less than twenty-four hours later, on June 26, 2025, Covetrus terminated Plaintiff, citing a "reduction in force" due to low workload.

138.    Rachel and Stephanie informed Plaintiff that due to "low workload" Plaintiff was being laid off.

139.    Plaintiff informed Rachel and Stephanie that the previous night he noticed monitoring

23

of communication with his attorney and further stated that he had an open HR grievance case for gender discrimination.

140. Rachel stated that she was not aware of any HR grievance or that monitoring of his computer had been authorized. Plaintiff then questioned the "low workload" reason that was given, stating that Plaintiff had continuously exceeded the requirement for a senior and if anyone was to be laid off last, that it would have been him.

141. Plaintiff also asked if anyone in his department was being laid off and Rachel stated yes, but that Plaintiff was the first one to be informed.

142. The same day, a colleague shared a company-wide email issued by Kimberly Grebner that did not mention a "reduction in force" due to low workload.

143. A colleague confirmed that Plaintiff was the only Senior 'laid off'.

144. No one informed Plaintiff of any broader reduction-in-force affecting his department, and no public or internal announcement described a Senior-level RIF in his unit.

145. Covetrus required Plaintiff to sign a computer monitoring agreement for his work device. Plaintiff was told that monitoring was used to ensure that agents were working, to support productivity and quality assurance, and to allow IT to assist with technical issues while agents worked from home. For example, Supervisor Tony told Plaintiff about an incident in which IT remotely accessed an agent's computer during a reported technical problem and observed the agent streaming entertainment instead of working. Covetrus did not inform Plaintiff that monitoring would be used to view the contents of his personal, password-protected webmail or attorney-client communications.

24

146.    Accessing Plaintiff's personal Gmail account required Plaintiff's password.

147.    To the extent Covetrus relies on that policy, Plaintiff alleges Covetrus exceeded the scope of any consent because the monitoring was directed at privileged, personal communications adverse to Covetrus and not at productivity or quality-assurance.

148.    At the time of termination, Plaintiff's ticket volume and quality metrics remained at or above those of the remaining Senior agents, based on internal dashboards available to Covetrus.

149.    Despite Plaintiff's report of suspected remote monitoring of his attorney-client communications, no one from HR or IT ever contacted him to investigate or follow up before or after his termination.

**Pretext indicators  ¶¶150-154**

150.    Covetrus's stated reason conflicts with contemporaneous performance records and the sequence of events.

151.    When Covetrus informed Plaintiff of the termination, it was delivered by two individuals, Rachel and Stephanie (last names unknown), whom Plaintiff had not previously worked with. They told Plaintiff that he was being laid off due to low workload and that other Senior agents in his department were also being laid off.

152.    Plaintiff later confirmed through a current employee that no other Senior in his department was terminated and that Covetrus later represented to unemployment authorities that Plaintiff was "terminated" rather than "laid off." This inconsistency

between what Covetrus told Plaintiff at the time and what Covetrus later reported supports an inference of pretext.

153.    Notably, Plaintiff's Vanguard 401(k) Retirement Savings Plan account records show a 'termination date' of June 3, 2025, three weeks before Covetrus communicated any termination. This discrepancy suggests that Covetrus had decided to terminate Plaintiff well before the alleged RIF and undermines the credibility of the June 26, 2025 termination rationale.

154.    Covetrus's explanation is also undermined by its selective reliance on monitoring that, by Covetrus's own terms, was limited to call-related windows; yet the observed remote access occurred while Plaintiff was reading personal, privileged email off-call.

## VI. CAUSES OF ACTION

### Count 1 — Sex Discrimination (Title VII and Maine Human Rights Act)

155.    Plaintiff incorporates ¶¶ 35–55 (recruitment, performance, training assurances), ¶¶ 56–94 (managerial bias and disparate treatment), and ¶¶ 150–154 (pretext).

156.    Covetrus discriminated against Plaintiff because he is male, affecting the terms and conditions of his employment and culminating in his termination.

157.    Independently of retaliation, Plaintiff was subjected to sex-based disparate treatment by Cottle, including unfavorable assignments and heightened scrutiny as compared to similarly situated female employees, and termination under circumstances giving rise to an inference of discrimination.

158.    Plaintiff seeks all remedies available under Title VII and the MHRA, including back pay, front pay, compensatory damages, and (where authorized) punitive damages. See 42 U.S.C. § 2000e-2(a); 5 M.R.S. § 4551 et seq.; and, in the alternative, 42 U.S.C. § 2000e-2(m).

**Count 2 — Retaliation (Title VII and Maine Human Rights Act)**

159.    Plaintiff incorporates ¶¶ 96–131 (HR complaints and protected activity, including EEOC, MHRC, and MDOL) and ¶¶ 132–141 and 150–154 (June 24–26 remote access and termination sequence and pretext).

160.    Plaintiff engaged in protected activity by reporting discrimination, filing with the EEOC/MHRC, consulting counsel; Covetrus knew of this activity.

161.    Covetrus then took materially adverse actions, including removal from overtime, inferior queue assignments, a spike in disputed Agent Errors, and termination less than twenty-four hours after Plaintiff observed remote access while viewing privileged emails with counsel.

162.    The temporal proximity and sequence support causation; Defendant's stated reasons are pretextual.

163.    Plaintiff seeks all remedies available under Title VII and the MHRA. See 42 U.S.C. § 2000e-3(a); 5 M.R.S. § 4633.

**Count 3 — Whistleblower Retaliation (Maine Whistleblowers' Protection Act)**

164.    Plaintiff incorporates ¶¶ 96–131 (reports to HR, EEOC, MHRC, and MDOL) and ¶¶

27

132–141 and 150–154 (temporal proximity and pretext).

165.    Plaintiff made good-faith reports and took protected steps to preserve and disclose suspected unlawful practices, including discrimination/retaliation (HR, EEOC, MHRC) and wage violations (MDOL); Covetrus knew of these reports.

166.    Plaintiff also reasonably believed that remotely accessing or attempting to access attorney-client communications in his personal, password-protected webmail violated privacy laws and company policy, and he preserved and reported that conduct.

167.    Covetrus retaliated by removing overtime, assigning inferior queues, issuing a spike in disputed Agent Errors, and terminating Plaintiff; Defendant's stated reasons are pretextual, including the inconsistent termination coding and rationale described in ¶¶151–153.

168.    Plaintiff seeks reinstatement or front pay, back pay, compensatory relief where authorized, injunctive relief, and reasonable fees/costs as available under 26 M.R.S. § 831 et seq.

**Count 4 — Intrusion Upon Seclusion / Invasion of Privacy (Maine common law)**

169.    Plaintiff incorporates ¶95 (monitoring policy and scope), ¶¶132–149 (observation of remote access to his personal, password-protected Gmail account, what Covetrus represented about monitoring, the scope of any consent, and the sequence of the termination meeting and reason given).

170.    Covetrus, through its employees and agents, intentionally accessed or attempted to access Plaintiff's work device remotely while he was logged into his personal,

28

password-protected Gmail account and viewing attorney-client communications regarding this dispute.

171.    Covetrus's own monitoring FAQ limited desktop capture to periods when an employee is logged into Five9 and only while a call is active; the remote access Plaintiff observed occurred while he was off-call, outside any active Five9 session, and exceeded the scope of any consent Plaintiff had given.

172.    Remotely accessing Plaintiff's personal, password-protected attorney-client communications on a work device, after representing that monitoring would be used for productivity and quality assurance rather than to review private email content, would be highly offensive to a reasonable person.

173.    As a direct and proximate result of this intrusion into his private affairs, Plaintiff suffered emotional distress, loss of privacy, and other damages, and he seeks compensatory and punitive damages, as well as appropriate equitable relief.

## VII. PRAYER FOR RELIEF ¶¶174–181

Plaintiff requests that the Court enter judgment in his favor and award:

174.    Declaratory relief that Defendant violated Plaintiff's rights under Title VII, the Maine Human Rights Act, the Maine Whistleblowers' Protection Act, and Maine common law (intrusion).

175.    Reinstatement or, in the alternative, front pay.

176.    Back pay and lost benefits, with pre- and post-judgment interest.

177.    Compensatory damages for emotional distress and reputational harm.

178.    Punitive damages as permitted by law.

179.    Costs taxable under law (including filing fees, service fees, and necessary printing/copying), reasonable attorney's fees where authorized by statute, and, if experts are later retained, reasonable expert fees as permitted by statute.

180.    Equitable relief including removal of discriminatory or retaliatory material from personnel files.

181.    Any further relief the Court deems just and proper.

## VIII. JURY DEMAND

182.    Plaintiff demands trial by jury on all triable issues.

Respectfully submitted,

*/s/ Aman Taffere*

244 Fort Hill Rd.

Gorham, ME 04038

(207) 383-9674

taffereaman@gmail.com

Plaintiff, Pro Se

**VERIFICATION**

I, Aman Taffere, declare under penalty of perjury that I am the Plaintiff in this action; I have read the foregoing Verified Complaint; and the facts stated therein are true and correct to the best of my knowledge, information, and belief.

Executed on November 24, 2025, in Gorham, Maine.

**Respectfully submitted,**

*/s/ Aman Taffere*

244 Fort Hill Rd.

Gorham, ME 04038

(207) 383-9674

taffereaman@gmail.com

Plaintiff, Pro Se

31

## Exhibit

**Exhibit A:** EEOC Right to Sue Letter

**Exhibit B:** MHRC Right to Sue Letter